# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Jesse Dominguez,                                Case Type:  Employment

           Plaintiff,

vs.                                             **COMPLAINT**
                                                **JURY TRIAL DEMANDED**

Life Time Fitness, Inc.,

           Defendant.

                                                Court File No. _____

---

Plaintiff, by his attorneys, Fabian May & Anderson, PLLP, brings this action for damages and other legal and equitable relief for Defendant's violations of law. Plaintiff states the following as his claims against Defendant:

## JURISDICTION AND VENUE

1.     This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., as amended, and the Civil Right Act of 1866, 42 U.S.C. § 1981. This Court has original jurisdiction to hear these claims under 28 U.S.C. § 1331.

2.     Plaintiff also asserts claims under Minnesota state law. This Court has supplemental jurisdiction to adjudicate Plaintiff's state law claims under 28 U.S.C. § 1367.

3.     The unlawful practices described hereinafter were committed in the District of Minnesota, the employment records relevant to those practices are, upon information and belief, maintained and administered at the offices of Defendant in the District of

Minnesota, and Defendant does business within Minnesota. Venue is therefore proper under 28 U.S.C. § 1391(b).

## PARTIES

4.      Jesse Dominguez ("Plaintiff" or "Dominguez") is an individual residing in Plymouth, Minnesota.

5.      Life Time Fitness, Inc. ("Defendant") is a Minnesota corporation with a registered address and principle place of business located at 2902 Corporate Place in Chanhassen, Minnesota.

## FACTUAL ALLEGATIONS RELATED TO ALL COUNTS

6.      Dominguez, a Hispanic male of Mexican heritage, was employed by Defendant at its Plymouth, Minnesota facility from in or around January 2002 until his involuntary termination on March 26, 2014.  For approximately the last eight years of his employment with Defendant, Dominguez was the only Hispanic employee at the Plymouth location.

7.      Dominguez first worked as a towel desk attendant, and thereafter received two merit-based promotions, first to Operations Supervisor, and then to Assistant Department Head, with corresponding pay increases.  Dominguez has received numerous recognitions for his superior effort and performance by club managers, co-workers, and Life Time Fitness management.  Before the events giving rise to his claims, all of his performance reviews were positive, and he had never been warned, counseled, or otherwise informed that his performance was deficient.

8.      In or around spring 2013, Dominguez started reporting to Operations Department Head Jake Wickstrom ("Wickstrom").  Wickstrom is a white male.

9.      On or about August 15, 2013, Wickstrom and General Manager Ashley Hall ("Hall") informed Dominguez that he would be demoted from Assistant Department Head to Operations Supervisor, and that his hourly rate of pay would be reduced by about 30%.  Hall told Dominguez that if he instead transferred to Defendant's facility in St. Louis Park, Minnesota, the pay reduction would be less severe (about 12%).

10.      Dominguez inquired into the reason for the unexpected demotion.  Hall responded by falsely alleging that all of Dominguez's previous General Managers and Department Heads had been contacted and that they had all expressed that Dominguez's performance was below par.  This shocked Dominguez, who to that point had always received positive performance reviews and was never warned, counseled, or otherwise informed that his performance was deficient.  When Dominguez asked for specific instances of deficient performance or other problems that he could address, he was provided none.

11.      Hall then claimed that Dominguez was also being demoted because he could not work "the required hours" for the Assistant Department Head position.  This also surprised Dominguez, because he had largely worked the same hours since his promotion to Assistant Department Head several years prior.  Dominguez therefore asked what the "required hours" were.  Hall stated she did not know and asked Wickstrom. Wickstrom struggled to provide an answer, eventually claiming that Dominguez could not work Fridays.  Dominguez had never been asked to work Fridays.

3

12.     Dominguez asked Wickstrom why he had not talked to him previously about these supposed issues.  Wickstrom admitted that he had not, but blew it off, stating, "My bad."

13.     After demoting Dominguez, Defendant placed a white male in the Assistant Department Head position previously held by Dominguez.

14.     Upon information and belief, no similarly situated non-Hispanic employee at Defendant's Plymouth location had been subjected to the same treatment to which Defendant subjected Dominguez.  Furthermore, one of Dominguez's former General Managers told Dominguez that he had not been contacted to discuss Dominguez's performance, as Hall had claimed.  Dominguez therefore sent a letter to Defendant's Human Resources office on August 26, 2013 complaining of discrimination and requesting a thorough investigation of his complaint.

15.     Shortly after Dominguez's August 26, 2013 letter, the offer to work in the St. Louis Park was changed so that it too would involve a 30% reduction in his hourly rate of pay.

16.     On Tuesday, September 3, 2013, Wickstrom called Dominguez at least twice and pressured Dominguez to make a decision as to whether he would stay in Plymouth or transfer to St. Louis Park.  Wickstrom, however, had previously told Dominguez that he was not required to make a decision until the end of that week.

17.     Early in the afternoon of September 4, 2013, Dominguez had a conversation by phone and text message with the Operations Department Head at the St. Louis Park location, Keith Moeller ("Moeller").  Moeller had previously supervised

4

Dominguez at the Plymouth location.  Moeller told Dominguez he could work that day at the St. Louis Park location, and stated via text message that Wickstrom had already cleared it with him.  Dominguez therefore reported to the St. Louis Park facility on September 4, 2013.

18.    Shortly after arriving to work in St. Louis Park, Dominguez received a call from a representative in Defendant's human resources department instructing him to report to the Plymouth facility.

19.    Thirty minutes after Dominguez's arrival at the Plymouth facility, Wickstrom gave Dominguez a disciplinary write-up, supposedly for attendance issues. The write-up reprimanded Dominguez for missing work on two occasions several months earlier, even though Dominguez had received prior permission to miss both days.  The write-up also reprimanded Dominguez for being late one day two months before. Finally, even though Wickstrom had previously authorized Dominguez to report to the St. Louis Park facility, the write-up reprimanded Dominguez for reporting to the St. Louis Park facility earlier that day instead of reporting to the Plymouth facility.

20.    Numerous white co-workers of Dominguez failed to report to work for scheduled shifts, reported late, or left work early without permission. Unlike Dominguez, these white co-workers did not receive reprimands or disciplinary write-ups.  Dominguez therefore initially refused to sign the disciplinary form.  But Wickstrom became incensed and demanded that Dominguez sign the form, repeatedly yelling "SIGN IT NOW!" Dominguez therefore signed the disciplinary form under duress.  Dominguez requested a copy of the disciplinary form, but Wickstrom refused to provide it to him.

5

21.     Dominguez later learned that on September 4, 2013, Wickstrom told a group of department heads in their management "huddle" that Dominguez would no longer be working at the Plymouth location and that they should come up with an answer for club members who might ask why Dominguez was no longer at the Plymouth facility.

22.     On September 9, 2013, Dominguez, through his counsel, sent a letter to Defendant further detailing Dominguez's complaints of discrimination and retaliation. As of September 9, Defendant had yet to implement the threatened demotion or pay decrease, but less than one month after the letter, Defendant implemented the demotion and reduced Dominguez's hourly rate of pay by 30%.

23.     On September 17, 2013, Wickstrom overheard another employee refer to Dominguez as "the amigo guy."  Defendant took no action to counsel, reprimand, or otherwise discipline the employee for using this racially-insensitive reference.

24.     On December 24, 2013, Dominguez filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

25.     Also in late December 2013, Defendant posted a notice seeking a new Assistant Department Head at Defendant's Plymouth facility.  This was the same position Dominguez had held less than four months prior.  Wickstrom was the hiring manager, and the position was open to all applications.  Dominguez submitted an application for the position on or about December 28, 2013.  Despite his substantial qualifications, Defendant did not interview Dominguez for the position.  Instead, on January 20, 2014, Defendant announced that the position was given to Ryan White ("White"), a less-qualified white male.

6

26.     White started at the Plymouth facility on or about February 5, 2014.  When Dominguez arrived to work on White's first day at the Plymouth facility, White followed Dominguez to the time clock, and immediately after Dominguez clocked in, directed Dominguez to perform an unusual number of tasks that were typically shared amongst the employees.  White specifically stated that Wickstrom had told him to assign these tasks to Dominguez.  Throughout the day, White called Dominguez over the radio excessively, instructing Dominguez to perform several additional tasks.  Meanwhile, other employees remained underutilized, standing around at the towel desk folding towels.  This pattern continued for several days.  The number of tasks assigned to Dominguez was so excessive that one employee asked Dominguez why it was happening.

27.     On February 12, 2014, Dominguez told White that he felt like he was being assigned excessive tasks while other employees were not busy, that it was unfair, and that he felt it was being done in retaliation for his complaints of discrimination and retaliation. White did not deny that the treatment was unfair or retaliatory, but instead stated that he was merely doing what Wickstrom had told him to do.

28.     Dominguez also noticed that fewer employees were scheduled to work on his shifts, requiring him to work harder to accomplish all the tasks during the shift.  This trend started in December 2013, but became markedly worse after White started.  For example, despite Mondays being one of the busiest days at the Plymouth facility, Dominguez's Monday shifts were often running with only 3-4 staff, whereas as shifts managed by white, non-Hispanic individuals, were covered by 5-7 people.  Staff were

also regularly pulled off Dominguez's Saturday afternoon shift and rescheduled for the Saturday morning shift, leaving Dominguez short-staffed on Saturday afternoons.

29.    On March 15, 2014, Dominguez complained to White about the staffing issues and asked why he was always required to work with a short staff.    White responded, "We want you to work harder."    Dominguez, however, had consistently been recognized by management and gym members as one of the hardest-working employees at the Plymouth facility.    Defendant was therefore not of the opinion that Dominguez was not a hard worker.    Instead, it was arranging the schedule unfairly in an effort to negatively impact Dominguez, ostensibly in hopes that he would quit.

30.    On Monday, March 17, 2014, Dominguez asked Wickstrom why fewer employees were scheduled to work during his shifts.    Wickstrom stated that Dominguez should be able to get the work done with 4 people.    Dominguez then asked why 5 employees were scheduled to work the same shift the next day when Dominguez was not scheduled to run the shift.    Wickstrom denied 5 employees were scheduled to work that shift.    Dominguez then went to get the schedule and showed it to Wickstrom, pointing out that 5 employees were clearly scheduled to work the same shift on Tuesday.    Wickstrom persisted in not responding to Dominguez's inquiry, and instead started aggressively questioning Dominguez as to why he supposedly could not "get it done" with 4 employees.

31.    On March 26, 2014, Dominguez was called into Wickstrom's office where he met with Wickstrom and Hall.    At the meeting, Hall informed Dominguez that he was being terminated immediately.    When Dominguez asked why he was being terminated,

Wickstrom claimed that he had listened to the radio on Monday and that Dominguez was not "calling the play"—Wickstrom's term for sustained radio chatter with other gym employees.  Wickstrom stated that Dominguez was being terminated as a result.

32.    Dominguez, however, had maintained sufficient radio contact with his staff to ensure all the work was done and customers received appropriate levels of service. Defendant had no policy requiring Operations Supervisors to maintain a high level of radio chatter, and Dominguez had received no prior warning or reprimand for supposedly failing to "call the play."

33.    Following his termination, Dominguez asked another supervisor at the Plymouth facility via text message whether that supervisor had been "calling the play." At first, the other supervisor did not know what Dominguez meant.  After Dominguez explained what "calling the play" meant, the other supervisor responded, "Nah ha ha why[?]"  This supervisor, who is white, remains employed by Defendant.

## CAUSES OF ACTION

## COUNT I

### DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2(a)(1).

34.    By reference hereto, Plaintiff incorporates the above paragraphs.

35.    During all relevant times herein, Plaintiff and Defendant were "employee" and "employer" respectively, within the meaning of 42 U.S.C. § 2000e.

36.    42 U.S.C. § 2000e-2(a)(1) of Title VII of the Civil Rights Act of 1964 provides that it is an unlawful employment practice for an employer to "discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin."

37.    By its conduct—including but not necessarily limited to demoting Plaintiff, reducing Plaintiff's wages, failing to promote Plaintiff to the open Assistant Department Head position, and terminating Plaintiff because of his race and/or national origin—Defendant violated 42 U.S.C. § 2000e-2(a)(1).

38.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of income, emotional distress, and other damages in an amount of excess of $75,000.

## COUNT II

### DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981.

39.    By reference hereto, Plaintiff incorporates the above paragraphs.

40.    The Civil Rights Act of 1866, 42 U.S.C. § 1981, prohibits discrimination in employment on the basis of race.

41.    By its conduct—including but not necessarily limited to demoting Plaintiff, reducing Plaintiff's wages, failing to promote Plaintiff to the open Assistant Department Head position, and terminating Plaintiff because of his race—Defendant violated 42 U.S.C. § 1981.

42.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of income, emotional distress, and other damages in an amount of excess of $75,000.

## COUNT III

## DISCRIMINATION IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT, MINN. STAT. § 363A.08, subd. 2.

43.    By reference hereto, Plaintiff incorporates the above paragraphs.

44.    During all relevant times herein, Plaintiff and Defendant were "employee" and "employer" respectively, within the meaning of Minn. Stat. § 363A.03.

45.    Minn. Stat. § 363A.08, subd. 2 of the Minnesota Human Rights Act provides that it is an unlawful employment practice for an employer to "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of that employee's "race. . . [or] national origin."

46.    By its conduct—including but not necessarily limited to demoting Plaintiff, reducing Plaintiff's wages, failing to promote Plaintiff to the open Assistant Department Head position, and terminating Plaintiff because of his race and/or national origin—Defendant violated Minn. Stat. § 363A.08, subd. 2.

47.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of income, emotional distress, and other damages in an amount of excess of $75,000.

## COUNT IV

## RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-3(a).

48.    By reference hereto, Plaintiff incorporates the paragraphs above.

49.     42 U.S.C. § 2000e-3(a) of Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

50.     Plaintiff engaged in conduct protected under § 2000e-3(a), including but not limited to reporting discrimination to Defendant's human resources department on August 26, 2013; providing additional information relating to Defendant's discriminatory and retaliatory conduct by way of a letter through counsel dated September 9, 2013; filing a charge of discrimination with the EEOC on December 24, 2013; reporting retaliation to White on March 15, 2014; and complaining to Wickstrom on March 17, 2014.

51.     Defendant retaliated against Plaintiff in violation of 42 U.S.C. § 2000e-3(a), by, among other things, reducing the pay Plaintiff would receive if he went to work at the St. Louis Park location, issuing an undeserved disciplinary reprimand, yelling at Plaintiff until he signed  the disciplinary reprimand, telling staff that Plaintiff would not be at the Plymouth facility for long, demoting Plaintiff and reducing his wages, allowing coworkers to use racially-insensitive terms in reference to Plaintiff, failing to promote Plaintiff to the open Assistant Department Head position, unfairly assigning a disproportionate amount of work to Plaintiff, scheduling fewer employees to work on Plaintiff's shifts, and terminating Plaintiff's employment.

52.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of income, emotional distress, and other damages in an amount of excess of $75,000.

### COUNT V

**REPRISAL IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT, MINN. STAT. § 363A.15.**

53.     By reference hereto, Plaintiff incorporates the paragraphs above.

54.     Minn. Stat. § 363A.15 of the Minnesota Human Rights Act provides that "[i]t is an unfair discriminatory practice for any . . . employer . . . to intentionally engage in any reprisal against any person because that person: (1) opposed a practice forbidden under this chapter or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter . . . ." A reprisal includes, but is not limited to, "any form of intimidation, retaliation, or harassment."

55.     Plaintiff engaged in conduct protected under Minn. Stat. § 363A.15, including but not limited to reporting discrimination to Defendant's human resources department on August 26, 2013; providing additional information relating to Defendant's discriminatory and retaliatory conduct by way of a letter through counsel dated September 9, 2013; filing a charge of discrimination with the EEOC on December 24, 2013; reporting retaliation to White on March 15, 2014; and complaining to Wickstrom on March 17, 2014.

56.     Defendant engaged in acts of reprisal against Plaintiff in violation of Minn. Stat. § 363A.15, by, among other things, reducing the pay Plaintiff would receive if he

went to work at the St. Louis Park location, issuing an undeserved disciplinary reprimand, yelling at Plaintiff until he signed the disciplinary reprimand, telling staff that Plaintiff would not be at the Plymouth facility for long, demoting Plaintiff and reducing his wages, allowing coworkers to use racially-insensitive terms in reference to Plaintiff, failing to promote Plaintiff to the open Assistant Department Head position, unfairly assigning a disproportionate amount of work to Plaintiff, scheduling fewer employees to work on Plaintiff's shifts, and terminating Plaintiff's employment.

57.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of income, emotional distress, and other damages in an amount of excess of $75,000.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jesse Dominguez prays for judgment against Defendant Life Time Fitness, Inc. as follows:

A.    For all damages available for Defendant's violations of Title VII of the Civil Rights Act of 1964, including back pay, front pay, damages for emotional distress and other compensatory damages, and punitive damages;

B.    For all damages available for Defendant's violation of the Civil Rights Act of 1866, including back pay, front pay, damages for emotional distress and other compensatory damages, and punitive damages.

C.    For all damages available for Defendant's violations of the Minnesota Human Rights Act, including back pay, front pay, and other compensatory damages, treble damages, damages for mental suffering, and punitive damages;

D.    For costs, disbursements, and attorney's fees; and

E.    For such other and further relief as the court deems just and equitable.

14

Dated: 04/22/2014                                          **FABIAN MAY & ANDERSON, PLLP**

    s/ David H. Redden
John A. Fabian, #13482X
David H. Redden, #391496
Attorneys for **Plaintiff Jesse Dominguez**
**FABIAN MAY & ANDERSON, PLLP**
1625 Medical Arts Building
825 Nicollet Mall
Minneapolis, MN 55402
Telephone:  (612) 353-3343
Fax: (612) 455-2217
Email: jfabian@fmalawyers.com
       dredden@fmalawyers.com